IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HAO-QI GONG, and JEFFERY PETERS,<br><br>    Plaintiffs,<br><br>v.<br><br>CITY OF ALAMEDA, et al.,<br><br>    Defendants.<br>_____/ | No. C 03-05495 TEH<br><br>**ORDER RE MOTIONS FOR SUMMARY JUDGMENT** |

This matter came before the Court on January 4, 2007 at 10:00 a.m. Having carefully considered the parties' written and oral arguments, and the record herein, and good cause appearing, the Court grants in part and denies in part Defendants' Motion for Summary Judgment and denies Plaintiffs' motion for summary judgment.

I. BACKGROUND

This action arises out of a child welfare inspection of Plaintiffs' son by the City of Alameda Police Department in 2003. Plaintiffs, Hao-Qi-Gong ("Gong") and Jeffrey Peters ("Peters") assert that their 4th and 14th Amendment rights were violated when Defendants (1) entered their apartment without a warrant, (2) subsequently arrested them, and (3) placed their son in temporary protective custody.[1] Plaintiffs seek damages

---

[1] As a threshold matter, Defendants contend that Peters' claims should be dismissed because while he was born Jeffrey Peters, he changed his name in the early 1990s to Jonathan Matrix Peters. When this issue was identified at Peters' deposition his counsel stated that he would bring a motion to amend the complaint to conform to Peter's legal name. Although Plaintiffs' counsel failed to do so until January 4, 2007,

pursuant to 42 U.S.C. § 1983 for these alleged deprivations. The two Defendants remaining in the case – Sergeant Ronald Jones ("Jones") and Sergeant Jon Westmoreland ("Westmoreland") – seek a summary judgment on all claims. Plaintiffs also seek a summary judgment in their favor on all claims.

The key facts underlying this case are as follows and except as noted, are undisputed.

In early 2003, the Alameda Police Department began receiving allegations that Kyle Peters, age 7, was being neglected and/or abused by his parents, Peters and Gong. The allegations were made by Kyles' grandmother (Peters' mother), Ms. Janet Friedman-Edwards ("Edwards"), who lives in Southern California. Kyle had previously stayed with her for about six months until January 2003 when Gong had retrieved him. On February 4, 2003, Detective Jill Ottaviano ("Ottaviano") went to Kyle's apartment to perform a welfare inspection. Gong answered the door and showed her Kyle but refused to allow Ottaviano into the apartment. *See* Fox Dec., Ex. E .

In February and March 2003, Kyle's grandmother continued to express concerns to the Alameda Police Department about Kyle's welfare in faxes and phone conversations, including the following: (1) Gong was involved in the sex escort business, (2) Kyle had told her that Gong had put her finger up his anus at least twice, (3) Kyle had excessive absences from school, (4) Kyle had previously been under investigation with the child protection agency in Santa Clara, California when Kyle's four front teeth were knocked out and he had been placed in a foster home for one month, (5) that Kyle's teeth had been neglected and that after an emergency visit to the dentist to extract an abscessed tooth, Kyle still required a root canal and six fillings, and (6) that Kyles' parents travel overseas for up to three weeks at a time in connection with their sex escort

---

the Court concludes that this misnomer in the complaint does not warrant dismissal of Peters' claims. Federal Rule of Civil Procedure 17(a) contemplates that a court may permit correction of a caption if the real party in interest has not been correctly identified. Here, the misstatement of Plaintiffs' first name did not prejudice Defendants and was not pursuant to any effort to hide the true identity of Mr. Peters. Accordingly, the Court will grant Plaintiffs' application to correct the caption.

2

service and that they never call in to whomever is taking care of Kyle or provide any way to contact them in case of emergency. *See* Fox Dec., Ex. A at 25, Ex. F. A copy of a dental record supporting the second to last allegation was also provided. *Id.* Kyle's grandmother also wrote to Kyle's school. *Id.* On March 5, 2003, Ms. Friedman- asked whether any safety checks had been done on Kyle. *Id.*, Ex. F.

Detective Ottaviano sought the assistance of Sergeant Jones. During the week of March 3, 2003, Jones checked on the internet but was unable to confirm that Gong was involved in a sex escort business and so closed out that part of the investigation. *See* Jones Dep. at 24. On Monday, March 10, 2003, Jones received a copy of Ms. Friedman-Edwards' latest fax, dated Friday, March 7, 2003, in which she addressed some of her concerns. Fox Dec., Ex. A at 95. Jones had an associate contact Kyle's school. If Kyle had been in school, Jones testified, he would have gone to check on him there. Jones Dep. at 95. After it was confirmed, however, that Kyle was not in school, Jones went to Kyle's apartment in Alameda, along with Detectives Munoz and Jaime, to check on Kyle's welfare. It was around 2:00 p.m. in the afternoon. Jones Dep. at 17-18; Ex. E at 5. The officers, who were all in plainclothes, knocked, announced their identity, and waited. When there was no response, they went to the apartment manager, Mary Ellen Juhnke ("Juhnke"), and returned with her to the apartment with a pass key. While there is some conflict as to whether Juhnke and Jones both knocked and spoke at this point or just Jones, it is undisputed that there was additional knocking and announcement at this time but no answer. Juhnke and the officers then saw a shadowy presence passing over the peep hole indicating that someone was inside. Peters also testified that he looked out the peep hole and saw a person he assumes was Ms. Juhnke.

When there continued to be no response, Jones used the manager's key to open the door. Jones again announced their presence and called for the person to come out. The apartment was so filled with boxes, cartons, dirty clothing, and miscellaneous debris that it was difficult to walk through the apartment. Juhnke Dep. at 48; Westmoreland Dep. at 40-42. Fox Dec., Ex. E at 5. At this point, Jones called for a back-up officer in

uniform so that it would be clear that it was the police department entering and not a burglar. *See* Jones Dep. at 37, 39. While waiting at the door for the back up officer to arrive, Peters walked toward them from the apartment hallway talking to someone on the cell phone, later identified as Gong. While there is a dispute as to the exact substance and tenor of the exchange, it is undisputed that Jones told Peters that the purpose of the visit was to check on Kyles' welfare based on concerns expressed by the grandmother. It is also undisputed that Peters told Jones that Kyle was not in the apartment but was with his mother who had gone to San Francisco to get a check for the rent  He did not answer Jones' question as to why Kyle was with his mother on an errand instead of in school. *Id*. at 45; Fox Decl., Ex. E at 6.

Peters resumed speaking to Gong on the cell phone and directed Gong to take Kyle directly to the police station and meet them there so that the police could see that Kyle was okay. Peters also told Jones that Kyle's grandmother was just making up false and erroneous things. Fox Dec., Ex. C at 249; *see also* Juhnke Dep. at 47; Fox Dec., Ex. E at 6. Jones asked Peters if he would also go and meet them at the station and Peters agreed. Jones asked Peters to call Gong again and confirm that she was going directly to the police station. Peters made a cell phone call but began speaking in an Asian language. Jones told Peters to hang up because he could not understand the conversation. Thereafter, it appeared to Jones that Peters had began stalling. Gong then suddenly appeared in the hallway of the apartment building – without Kyle. This turn of events took Jones by surprise because Peters had told him that Kyle was with Gong and that they were enroute to the police department.

According to Jones, the following events then transpired. He asked Gong, who had a "deer in the headlights" look, if Kyles was in the apartment but she didn't respond. Jones Dep. at 59. Peters started to say something, Gong looked at him, and Jones told her, "don't look at him. . . . Answer my questions." *Id*. at 60. Neither Gong nor Peters responded. According to Jones, Gong then attempted to walk into the apartment a second time although he had already told her to stay where she was. Jones jumped in

4

1   front of her and put his arm out across the hallway to block her entrance.  He then asked
2   her again if Kyle was inside and she "finally said yes." *Id.*   Jones then arrested both
3   Gong and Peters for obstructing his welfare check of Kyle pursuant to California Penal
4   Code § 148 which makes it a crime to "wilfully resist[], delay[], or obstruct[] any. . .
5   peace officer . . . in the discharge or attempt to discharge any duty."

6   Gong's version is as follows.  She testified that the cell phone kept cutting in and
7   out when she was talking earlier to Peters.  She only recalls him telling her to meet him
8   at the police station.  She doesn't recall him asking if Kyle was with her or telling her to
9   take Kyle to the police station. *See* Gong Dep. at 220.  She testified that she assumed
10  Kyle was in the apartment but she was too shocked at the situation to answer Jones'
11  questions when she encountered the officers at the front door of her apartment.  She
12  states that she never moved her feet or attempted to walk toward the apartment doorway;
13  rather she just stood and leaned to the right in an effort to see Peters and make eye
14  contact with him. *Id*. at 226, 228.   She testified that after a few quick questions Jones
15  arrested her for not cooperating. *Id*. at 228.

16  After Gong and Peters were taken into custody,  Jones entered the apartment and
17  asked Kyle to come out.  Kyle peeked out of a room and slowly came forward.  Jones
18  called Sargent John Westmoreland ("Westmoreland"), a member of the police
19  department's youth services to interview Kyle about the grandmother's allegation that
20  Gong had digitally penetrated him.  Westmoreland testified that when the conversation
21  turned to this topic Kyle confirmed that Gong had digitally penetrated him twice and that
22  it was to help him to go to the bathroom.  Westmoreland believed, having talked to
23  hundreds of kids over the years in similar types of cases, that the answer was rehearsed.
24  He observed that when the conversation turned to this subject Kyle became withdrawn,
25  spoke in a whisper, and would no longer make eye contact.  Following the interview,
26  Westmoreland placed Kyle in temporary protective custody primarily because Kyle's
27  parents' arrests left him without any adult supervision.  He also had Gong charged with
28

5

1 additional violations of Penal Code sections 288(a) and 289(d)(4) relating to sexual
2 abuse. Westmoreland Dep. at 56-57.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when there is no genuine dispute as to material facts and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Toscano v. Prof'l Golfers Ass'n*, 258 F.3d 978, 982 (9th Cir. 2001). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.* The court may not weigh the evidence and must view the evidence in the light most favorable to the nonmoving party. *Id.* at 255.

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Id.* at 322-323. However, on an issue for which its opponent will have the burden of proof at trial, the moving party can prevail merely by "pointing out to the District Court . . . that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. If the moving party meets its initial burden, the opposing party must then "set forth specific facts showing that there is a genuine issue for trial" in order to defeat the motion. Fed. R. Civ. P. 56(e); *Anderson,* 477 U.S. at 250.

## III. PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Pursuant to this Court's Order for Pretrial Preparation, the parties' motions for summary judgment were due on November 13, 2006. The Court continued this deadline to November 20, 2006 in order to accommodate the schedule of counsel for defendants. On December 5, 2006, Plaintiffs filed a single document purporting to be both an

opposition to Defendants' Motion for Summary Judgment and a "Motion for Summary Judgment."

As this purported "motion" is over two weeks late, it is denied as untimely. The Court also notes that Plaintiffs' opposition was due December 4, 2006, and thus was one day late. The Court will consider it, however, given that (1) Defendants have not identified any prejudice that resulted from the tardiness of the filing, and (2) the Court's preference to decide matters on the merits. Plaintiffs are forewarned, however, that any additional late filings will likely result in the imposition of sanctions.

## IV. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### A. FOURTH AMENDMENT CLAIM FOR ENTRY WITHOUT A WARRANT

Plaintiffs contend that Defendants' entry into the apartment without a search warrant violated their fourth amendment rights. Defendants contend that the entry was authorized by the "emergency aid" exception to the warrant requirement, and that even if it was not, Defendants are protected against a suit for damages by qualified immunity.

Under the "emergency aid" exception, police officers are permitted warrantless entry into a home as part of their "community caretaking function." *Martin v. City of Oceanside*, 360 F.3d 1078, 1082 (9th Cir. 2004). Under this "emergency aid" exception, police officers may make warrantless entries when they "reasonably believe that a person within is in need of immediate aid." *Id*. (*quoting Mincey v. Arizona*, 437 U.S. 385, 392 (1978)). Specifically, this exception applies if (1) the police have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property, and (2) there must be some reasonable basis approximating probable cause to associate the emergency with the area or place to be searched. *Id*. at 1081-82. [2]

---

[2] The Ninth Circuit emergency aid exception also included a third element, "that the search must not be primarily motivated by intent to arrest and seize evidence." In the recent case of *Brigham City, Utah v. Stuart,* __ U.S. __, 126 S.Ct. 1943 (2006), however, the Supreme Court disapproved of injecting a subjective

7

With respect to Defendant's claim for qualified immunity, courts first consider whether, taken in the light most favorable to the party asserting the injury, the facts show a violation of a constitutional right – which in this case would be a violation of the Fourth Amendment. Second, the Court asks whether the officer could nevertheless have "reasonably but mistakenly believed that his or her conduct did not violate a clearly established constitutional right." *Jackson v. City of Bremerton*, 268 F.3d 646, 651 (9th Cir. 2001). This is "an objective standard" that leaves "'ample room for mistaken judgments.'" *Duran*, 904 F.2d at 1376. Indeed the standard protects "'all but the plainly incompetent or those who knowingly violate the law.'" *Franklin v. Fox*, 312 F.3d 423, 437 (9th Cir. 2002) (citations omitted).

In this case, the Court concludes, for the reasons explained below, that the undisputed facts indicate that the emergency aid exception is applicable here. Further, even if it were not, the Court concludes that Jones could have reasonably but mistakenly believed that the exception was applicable.

Plaintiffs do not question that the emergency aid exception can be invoked in the context of a child welfare check. Nor do Plaintiffs dispute that Jones had grounds to go to Kyle's apartment to conduct a safety welfare check on Kyle on March 10, 2006. At the same time, Defendants concede that there was no emergency at the time Jones went to the apartment to check on Kyle. Rather, both parties agree that the key question is "whether Jones reasonably believed there was an emergency based on the grandmother's information, Kyle's absence from school that day, *and the refusal of someone inside the apartment to answer the door*." *See* Pls.' Opp. at 6; Defs.' Reply at 2 (emphasis added).

This Court agrees with Defendants that once they were at the apartment door and it was clear that someone was inside – but refusing to answer the door – the situation changed. At this point, Jones could reasonably conclude that Kyle was either alone

---

element into the test. Rather, the focus should be on whether the action is objectively reasonable under the Fourth Amendment, "regardless of the individual officer's state of mind." *Id*. at 1948. In any event, Plaintiffs do not assert that Jones was motivated by any improper motive in this case.

8

inside (since he was not at school) or that there was an adult inside with Kyle who was refusing to answer the door despite knowing it was the police repeatedly knocking. Under these circumstances, and given the allegations of abuse and neglect, Jones could reasonably conclude that Kyle could be in an unsafe situation and in need of immediate aid. As such, the emergency aid exception protects Jones' use of the pass key to open the door and ascertain Kyle's welfare.

Even if the exception is not applicable, Jones could have reasonably believed that his actions did not violate clearly established law. In *Martin v. City of Oceanside*, 205 F. Supp.2d 1142 (S.D.Cal. 2002), a father who had been unable to reach his adult daughter told the police that he was urgently concerned for her welfare. *Id*. at 1150. The police went to house where she was living as a roommate but no one answered the door despite repeated knocking. A call to her phone number was also not answered. The police had reason to believe she was in the house because her car was in the drive way.

The district court, ruling in 2002, concluded that under these circumstances the emergency aid exception justified the officers' entry in the house to check on the daughter's welfare. In affirming, the Ninth Circuit emphasized that police have "a duty under the community caretaking function to investigate a potential emergency situation":

> The officers' reasonable conclusion that a potential emergency situation could be located inside Martin's home was sufficiently supported by a father's concern about his daughter, the neighbor's indication that the daughter should be in the residence, the presence of her car in the driveway, and the unexplained failure to respond to their knock on the door.

*Martin*, 360 F.3d at 1082. As in *Martin*, Jones similarly believed that he faced a potential emergency situation based on the grandmother's allegations regarding the neglect and abuse of her grandson, Kyle's absence at school, and the unexplained failure of someone inside to respond to the repeated knocking on the door by the police. Thus, even if Jones did not in fact have grounds for a warrantless entry under the emergency

9

aid exception, he could have mistakenly but reasonably believed that his entry did not violate clearly established constitutional law in light of *Martin*.

Plaintiffs argue that Jones should have discounted the grandmother's "campaign" to have Plaintiffs investigated as a custody struggle between the grandmother and the Plaintiffs, particularly given the grandmother's reference in one fax to "grandparent rights." The grandmother's letters and faxes, however, were also entirely consistent with those of a close relative who has a legitimate and genuine concern for the child. *See* Fox Dec., Ex. F. As such it was not unreasonable for Jones to treat the grandmother's concerns seriously.

Given all of the above, the Court finds that Defendants are entitled to a summary judgment on Plaintiffs' fourth amendment claim based on Defendants' warrantless entry.

### B. FOURTH AMENDMENT CLAIM FOR UNLAWFUL ARREST

#### 1. Jeffrey Peters

Peters contends that Defendants lacked probable cause to arrest him for a violation of California Penal Code § 148 which makes it a crime to "wilfully resist[], delay[], or obstruct[] any. . . peace officer . . . in the discharge or attempt to discharge any duty." Probable cause to arrest exists when the "facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). The evidence need support "'only the probability, and not a prima facie showing, of criminal activity.'" *Franklin*, 312 F.3d at 438 (citation omitted). Once a defendant has provided "some evidence" of probable cause, it is the plaintiff's burden to prove a lack of probable cause. *Dubner v. City and County of San Francisco*, 266 F.3d 959, 965 (9th Cir. 2001).

Here, Jones was reasonable in believing, based on all of the circumstances known to him, that Peters was attempting to interfere with or delay his duty of conducting a welfare check of Kyle. First, Peters told Jones that Kyle was not in the apartment when in fact he was in the apartment. Second, he told Jones that Gong was going to the police station with Kyle to meet Jones when in fact she was not. Third, by calling Gong back in a foreign language it appeared that Peters might be trying to end-run the welfare check. Fourth, Peters then acted as if he were stalling his departure from the apartment. Fifth, once Gong arrived, Peters and Gong continued to delay in identifying Kyle's location.

Plaintiffs argue that section 148 does not specifically criminalize lying to the police whereas other statutes do (*see e.g.* Calif. Penal Code § 148.9 which makes it a crime to give a false name at time of booking). The fact that other statutes make a specific lie a criminal act, however, does not necessarily imply that the police are prohibited from considering lies (or statements that reasonably appear to be lies) in determining whether someone is attempting to interfere with or delay the discharge of a duty under § 148. Further, the misstatements here accompanied the physical act of refusing to produce Kyle for the welfare check although he was in the apartment the entire time.

In sum, given all of the above, Jones had probable cause to arrest Peters for attempting to interfere with or delay the welfare check of Kyle in violation of § 148. Even if he did not, a "reasonable officer could have believed that probable cause existed to arrest." *Franklin*, 312 F.3d at 437. As such, Jones has qualified immunity with respect to this claim. *Id.* Accordingly, Defendants are entitled to a summary judgment with respect to Peters' claim for false arrest.

### 2. Gong

While a reasonable officer clearly had grounds to believe that Peters was engaged in an effort to interfere with or delay the welfare check of Kyle, there is less direct

1 evidence of such affirmative efforts by Gong, particularly given the timing of her return
2 to the apartment with a "deer in the headlights" look.  Further, there is a significant
3 factual dispute.  Jones emphasized that he arrested Gong because she disobeyed his order
4 not to go into the apartment.  *See* Jones Dep. at 61.  While disobedience of a direct order
5 would be a relevant consideration, Gong flatly denies that she disobeyed this order.  If
6 this factual dispute is resolved in Plaintiffs' favor, and other inferences are drawn in her
7 favor, there is insufficient evidence to establish qualified immunity.  Accordingly, the
8 Court concludes that Defendants' motion for summary judgment and qualified immunity
9 on this claim should be denied with respect to Gong's arrest under section 148.  *Prison*
10 *Legal News v. Lehman*, 397 F.3d 692 (9th Cir. 2005)(summary judgment should be
11 denied where factual dispute precludes determination of qualified immunity).

12 Plaintiffs also contend that there was no probable cause for the sex offenses added
13 later by Sergeant Westmoreland.  Plaintiffs argues, for the first time at oral argument,
14 that regardless of the validity of Plaintiffs' initial arrest, that the lack of probable cause
15 on the sex offense charges creates a separate fourth amendment claim because these later
16 added charges lengthened her detention.  Even assuming *arguendo* that Plaintiffs are
17 correct, *see  Merkle v. Upper Dublin School Distr.*, 211 F.3d 782, 790  n. 7 (3rd. Cir.
18 2000), this claim fails because the Court concludes that there was probable cause to
19 support the sex offense charges in light of: (1) the grandmother's allegations, (2) the
20 confirmation of the digital penetration by Kyle, and (3) Westmoreland's assessment of
21 Kyle's verbal and non-verbal responses during his interview with Kyle.

22 Plaintiffs argue that Westmoreland had no specific evidence that Gong possessed
23 an "intent to arouse."  They offer no authority, however, that an officer must have
24 specific evidence of such intent at the time the charges are made.  Further, even if
25 Westmoreland lacked probable cause to add the charges, the Court finds that he is
26 protected by qualified immunity because a "reasonable officer could have believed that
27 probable cause existed to arrest" given all of the circumstances.  *Franklin*, 312 F.3d at
28 437.

12

### C. FOURTEENTH AMENDMENT RIGHT FOR PLACEMENT OF KYLE IN TEMPORARY CUSTODY

Finally, Plaintiffs claim that Defendants violated their rights to "family association" under the fourteenth amendment when Kyle was placed in temporary protective custody after Peters and Gong were arrested and taken into custody. Plaintiffs concede that when parents are not longer present (because they are taken into custody) that the state has the authority to place a young child such as Kyle in protective custody. *See* Pls.' Opp. At 15. Plaintiffs, argue, however, that because their fourth amendment rights were violated when they were arrested, that Defendants should not be able to rely on this authority. In short, they essentially argue that they have a derivative fourteenth amendment claim based on the alleged fourth amendment violation.

Plaintiffs cite no authority that provides for such a derivative claim. Rather, it appears that the "loss of familial association" that Plaintiffs complain of is more appropriately viewed as an element of damages arising from the alleged false arrests since, as Plaintiffs assert, it is the false arrests that caused the familial separation. Accordingly, the Court shall dismiss Plaintiffs' fourteenth amendment claim for failure to state a claim for relief. In the event, however, that Plaintiff Gong were to prevail on her false arrest claim, she could seek to recover, as part of her damages for that claim, the damages she sought in her fourtheenth amendment claim.

## V. CONCLUSION

Accordingly, and good cause appearing it is HEREBY ORDERED that:

1. Plaintiffs' Motion for Summary Judgment is denied as untimely.

2. Defendants' Motion for Summary Judgment is granted with respect to all claims and all parties, except with respect to Plaintiff Gong's claim for false arrest against Defendant Jones.

13

3. The parties are referred to Magistrate Judge Elizabeth LaPorte for a mandatory settlement conference.. All remaining pretrial and trial dates are vacated to provide the parties a final opportunity to settle this matter.

4. In the event no settlement is reached the parties shall appear on February 12, 2007 at 1:30 p.m. to reset the remaining pretrial and trial dates.

**IT IS SO ORDERED.**

Dated: January 17, 2007

THELTON E. HENDERSON
UNITED STATES DISTRICT JUDGE

14